Case 1:21-cv-01105-WMS-LGF    Document 1-1    Filed 10/08/21    Page 1 of 38

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WAYNE
------------------------------------------------------------------------x
THOMAS CARRANO and GINA CARRANO,

                Plaintiffs,

    -     against    -

AMERICAN SOCIETY FOR THE PREVENTION
OF CRUELTY TO ANIMALS, THE HUMANE
SOCIETY OF ROCHESTER AND MONROE
COUNTY FOR THE PREVENTION OF CRUELTY
TO ANIMALS, INC., d/b/a LOLLYPOP FARM,
CHAUTAUQUA COUNTY HUMANE SOCIETY,
CRACKER BOX PALACE, INC.,

                Defendants.
------------------------------------------------------------------------x

Index No.

**SUMMONS**

**Hon.**

Date Index No.
Purchased _____

To the Above-Named Defendants:

PLEASE TAKE NOTICE THAT YOUR ARE HEREBY SUMMONED to answer the

complaint of the plaintiffs herein and to serve a copy of your answer on the plaintiffs' counsel at

the address indicated below within 20 days after the service of this Summons (not counting the

day of service itself), or within 30 days after service is complete if the Summons is not delivered

personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you failed to answer, a judgment will be

entered against you by default for the relief demanded in the complaint.

Dated: August 10, 2021

                Steven L. Kessler, Esq.
                LAW OFFICES OF STEVEN L. KESSLER
                P.O. Box 100
                Wykagyl Station
                New Rochelle, New York 10804

Venue: Plaintiffs designate Wayne County as the place of trial.  The basis of this designation is the place of residence of the plaintiffs.

Defendants' Addresses:

American Society for the Prevention of Cruelty to Animals (ASPCA)
424 East 92nd  Street
New York, NY 10128-6804

The Humane Society of Rochester and Monroe
County for the Prevention of Cruelty
To Animals, Inc., D/b/a Lollypop Farm,
99 Victor Road
Fairport, NY 14450

Chautauqua County Humane Society
2825 Strunk Road
Jamestown, NY 14701

Cracker Box Palace, Inc.
6420 Shaker Road
North Rose, NY 14516

2

Case 1:21-cv-01105-WMS-LGF    Document 1-1    Filed 10/08/21    Page 3 of 38

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WAYNE
------------------------------------------------------------------------x
THOMAS CARRANO and GINA CARRANO,

        Plaintiffs,

    -     against    -

AMERICAN SOCIETY FOR THE PREVENTION
OF CRUELTY TO ANIMALS, THE HUMANE
SOCIETY OF ROCHESTER AND MONROE
COUNTY FOR THE PREVENTION OF CRUELTY
TO ANIMALS, INC., d/b/a LOLLYPOP FARM,
CHAUTAUQUA COUNTY HUMANE SOCIETY,
CRACKER BOX PALACE, INC.,

        Defendants.
------------------------------------------------------------------------x

**VERIFIED**
**COMPLAINT**

Index No.

THOMAS CARRANO and GINA CARRANO, by their attorneys, LAW

OFFICES OF STEVEN L. KESSLER, allege as follows:

## NATURE OF THIS ACTION

1. This is an action sounding in tort for damages to plaintiffs' property.

## PARTIES

2. At all relevant times, plaintiffs Thomas and Gina Carrano ("the Carranos")

have resided in Wayne County, New York, where they own and maintain a farm

registered with the New York State Department of Agriculture and the National Poultry

Improvement Plan where they have bred and raised prize gamefowl since 2008.

3.      The American Society for the Prevention of Cruelty for Animals ("ASPCA") is a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code and corresponding provisions of the laws of the State of New York, with principal offices located in the City and State of New York and operations throughout the State of New York.  According to its 2019 audited financial statement, the ASPCA holds more than $339 million in net assets, including $223 million in investments.

4.      The Humane Society of Rochester and Monroe County for the Prevention of Cruelty to Animals, Inc., d/b/a Lollypop Farm, ("Lollypop"), is a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code and corresponding provisions of the laws of the State of New York, with principal offices in Fairport, Monroe County, New York.  According to its 2020 audited financial statement, Lollypop holds more than $28 million in net assets, including $16 million in investments.

5.      Chautauqua County Humane Society ("Jamestown")  is a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code and corresponding provisions of the laws of the State of New York, with principal offices in Jamestown, Chautauqua County, New York.  According to its 2018 audited financial statement, Jamestown holds more than $3.8 million in net assets, including $2 million in investments.  Jamestown received $80,000.00 from defendant ASPCA in 2020 alone, although on its website "FAQs", it claims that it is "not affiliated with or funded by . . . the American Society for the Prevention of Cruelty to Animals . . .."

2

6. Cracker Box Palace, Inc. ("Cracker Box") is a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code and corresponding provisions of the laws of the State of New York, with principal offices in Alton, Wayne County, New York. According to its 2019 Char 500, Cracker Box holds net assets of just under $1 million.

## VENUE

7. Venue is proper in this Court pursuant to CPLR 503(a).

## FACTS

The Property at Issue

8. The 'property' that the Defendants damaged are actually living creatures: Heritage Chickens. According to the website of the Livestock Conservancy, a Heritage Chicken "must be from parent and grandparent stock of breeds recognized by the American Poultry Association (APA) prior to the mid-20th century; whose genetic line can be traced back multiple generations; and with traits that meet the APA Standard of Perfection guidelines for the breed." Heritage chickens "must include the variety and breed name on the label."

9. In addition to flawless bloodlines, to qualify as Heritage Chickens, they "must be produced and sired by an APA Standard breed. Heritage eggs must be laid by

3

an APA Standard Breed.  Heritage Chickens must be reproduced and genetically maintained through natural mating.  Chickens marked as Heritage must be the result of naturally mating pairs of both grandparent and parent stock."

10.    Further, Heritage Chickens must "have the genetic ability to live a long, vigorous life and thrive in the rigors of pasture-based, outdoor production systems."  They "must have a moderate to slow rate of growth . . . to develop strong skeletal structure and healthy organs prior to building muscle mass."

11.    Properly bred, raised and sired Heritage Chickens are extremely valuable.  Expert testimony in court cases have cited average value ranges in the tens of thousands of dollars apiece.  *See*, *e.g.*, *Oregon v. Morales*, Case No. 15-747CR, hearing transcript (Or. Circuit Ct., Klamath County May 22, 2015).  As noted in that testimony, pure "championship" bloodlines would be far more valuable.   Indeed, some have been valued in excess of $100,000.

12.    In one famous historical example, in 1919, a Heritage rooster owned by President Woodrow Wilson fetched $55,000 – more than $850,000 in today's dollars – at a "Rooster Booster" auction to help fund the completion of the Dixie Overland Highway in Alabama.  See www.roosterdaydemopolis.com/1919-rooster-auction.html.

The Carranos' Heritage Chicken Farm

13.    The Carranos moved from Long Island to Ontario, New York, in 2008 to

4

acquire agricultural land where they could grow and develop their passion for breeding and raising rare bloodlines of Heritage Chickens.

14.     Over time, the Carranos acquired Heritage Chickens from three highly prized bloodlines – Sweater Greys, McLeans and White Hackles – from top breeders down the Eastern seaboard.

15.     Further, a close friend and noted breeder, Joe Zanino, who died in 2017, had gifted the Carranos two rare Dixie Grey breeders, known as the James "Mac" White Grey, each valued at approximately $100,000, three Joe Z. Whites from a rare bloodline from the 1800s, and seven Heritage breed adult males.  Mr. Zanino also left Mr. Carrano a box of historic gamefowl memorabilia.

16.     In breeding and raising their Heritage Chickens, the Carranos rigorously followed the APA Standards of Perfection.  This included preserving the gene pool of Heritage bloodlines by breeding from a trio of two hens from the same family and one rooster.  If the trio is broken, the bloodline is destroyed.  The Carranos' farm was registered with the New York State and Federal government and was inspected and certified annually by the U.S. Department of Agriculture for the six years preceding the seizure of their birds.  *See*, *e.g.*, N.P.I.P. Flock Inspection Report A1-416 (Inspector #56).

17.     The Carranos entered their Heritage Chickens in poultry shows, which are run by regulated entities like the American Bantam Association and the Association for the Preservation of Gamefowl, under the APA's Standards of Perfection.  Owners exhibit

5

their birds to a panel of judges, and prizes are awarded based on bloodline, breeding, appearance and conduct. Breeders must provide the highest level of care and feeding from before birth for their birds to even qualify, let alone win, as the Carranos' Heritage Chickens did on several occasions.

18.     A primary requirement for birds to qualify for entry in poultry shows is that the sharp spurs on their legs be trimmed and the comb, wattles and ear lobes of the adult males be trimmed – called "dubbing" – in accordance with specific standards published by the APA. *See*, *e.g.*, *American Standard of Poultry Perfection*, Forty-Fourth Edition, p. 8 (2015). Dubbing and spur trimming reduce injuries both to the roosters and to caretakers and judges. "[A] slight scratch from the spur can result in a serious infection to a human. To minimize the chance of injuries all show rules call for the spur to be trimmed as a safety precaution." United Gamefowl Breeders Association website, www.ugba.net.

19.     Mr. Carrano worked with the New York chapter of the United Gamefowl Breeders' Assocation (NYGBA), becoming its Secretary and then, from 2012-2016, its President.

Investigation by NYPD

20.     In or about 2016-2017, the Carranos' farm became a target of a criminal investigation, the unlikely result of a combination of Mr. Carrano's kindness, law

6

enforcement overreaching, ignorant zealousness by the Defendants and others, and plain bad luck. Three "overt acts" eventually formed the basis for federal criminal charges. Yet, there was no charge, or evidence, that any of the Carranos' Heritage Chickens were themselves ever involved in cockfighting or any other banned activity.

21.    As President of NYGBA, Mr. Carrano had numerous duties, including working with the New York State Farm Bureau and other organizations to promote Heritage Chicken poultry shows, protect members' rights to own, breed and show game fowl and, of course, recruit new members. It also is in Mr. Carrano's nature to try to help people.

22.    As NYGBA President, Mr. Carrano occasionally encountered unusual requests. In one instance, a NYGBA member who kept chickens in the New York metropolitan area asked Mr. Carrano to house several of the member's birds on the Carranos' farm while the member made new arrangements. There was nothing in it for the Carranos but labor and expense. These were not Heritage Chickens and had to be cared for separately. The member, who had promised Mr. Carrano that he would take back his birds within a month or so, kept putting him off. Mr. Carrano eventually asked a fellow NYGBA officer who owned a farm in the Albany area to house two of the member's chickens, where one of them died in a scuffle with another rooster as a result of the owner failing to separately pen the birds.

23.    While the government alleged that this rooster was 'killed in a cockfight,'

7

the term as used by the government – connoting illegal activity – was different from reality and how bird owners use the term. "Cockfight" commonly refers to natural conflicts between male chickens, not the illegal activity conducted for profit which was alleged by the government.  As the United Gamefowl Breeders Association notes on its website:

> The males of the species are separated to prevent fighting which, is a genetic instinct handed down from their ancestors. This instinct is not unique to the gamefowl as all chickens are descended from the Red Jungle Fowl and have a natural fighting instinct. However, the breeds raised by gamefowl breeders represent strains with a truer genetic relationship to the Red Jungle Fowl. This instinct for fighting is inherited. It is not something that can be 'bred' or 'trained' into the birds.

http://www.ugba.net (last visited August 10, 2021).

24.     The Carranos later learned that the member who sent the birds to Mr. Carrano had been under investigation by the NYPD for illegally staging rooster fights for money.  That investigation led to the Carranos' farm. And, because the member had shipped chickens to Mr. Carrano, this sequence of events became the basis for the allegation that Mr. Carrano had "received" fighting birds in interstate commerce, the first "overt act"  alleged in the criminal case against him.  *See* 7 U.S.C. § 2156(e).

25.     The second "overt act" charged that Mr. Carrano possessed cockfighting "paraphernalia, gaffs, and roosters altered in a manner consistent with cockfighting." Apparently, people who fight roosters trim their spurs, not to qualify them for poultry shows, but to permit the attachment of "gaffs" – razor-sharp blades – to their legs.

8

Case 1:21-cv-01105-WMS-LGF    Document 1-1    Filed 10/08/21    Page 11 of 38

Further, cockfighting paraphernalia, including gaffs, were in the box of memorabilia that

Joseph Zanino had sent to Mr. Carrano from his home in Maryland. The box, bearing Mr.

Zanino's name, had been stored in the Carranos' home and never used for any purpose by

the Carranos. The government had the gaffs tested and found traces of dried blood of an

indeterminate age on one or more of them. The mere possession of these items is not a

federal crime; they must be transported or delivered in interstate or foreign commerce. 7

U.S.C. § 2156(e).

26.     The third alleged overt act was based on messaging between Mr. Carrano

and a NYGBA member on the NYGBA Facebook page where Mr. Carrano had

mentioned the death of one of the birds shipped from New York City on the farm of Mr.

Carrano's colleague.

27.     These allegations formed the basis of a "conspiracy" charge to violate the

federal Animal Welfare Act, even though no proof had been adduced that a single

chicken on the Carranos' farm had been involved in cockfighting or any other illegal

activity, or had ever been treated with anything but the highest level of care. The

government's case was based on Facebook page text messages, Mr. Carrano's agreement

to temporarily house some of the NYGBA member's birds, memorabilia received as a gift

and the proper preparation of the Carranos' Heritage Chickens for poultry shows.

9

Seizure of the Carranos' Birds and Destruction of Heritage Chicken Eggs

28. On May 23, 2017, the Carranos' farm was raided by a group of approximately 40 persons, including NYPD and USDA agents, as well as ASPCA personnel, including ASPCA Director of Veterinary Forensic Sciences Dr. Rachel Touroo, ASPCA Forensic Veterinarian Alison Liu, ASPCA Field Investigations and Response professional responders Dave Marcantel and Tammy Gregory, ASPCA employee Roni Afriat and numerous volunteers enlisted by the ASPCA.

29. There has never been any claim, let alone proof, that any of the ASPCA personnel assigned to the raid had any knowledge or experience regarding Heritage Chickens, gamefowl or poultry show requirements.

30. During the raid, the ASPCA personnel, including at least two of its veterinarians, watched as law enforcement agents deliberately broke more than 300 extremely valuable Heritage Chicken eggs.

ASPCA Veterinarians Confirm the Excellent Health and Condition of the Carranos' Birds

31. Within two days of the seizure of the Carranos' birds, Drs. Liu and Touroo, the ASPCA veterinarians, inspected the birds and recorded their observations in a report dated June 8, 2017 ("the Liu Report"). See Liu Report at p.1 ("On 05/24/17 and 05/25/17, Drs. Alison Liu and Rachel Touroo performed veterinary forensic medical exams on all 104 birds at the temporary shelter").

10

32.     The Liu Report is a damning document – for the Defendants.  It confirms that the Carranos' birds were in excellent health and condition at the time they were seized.  The report cites no evidence that even a single one of the Carranos' birds had been involved in any fighting activities.

33.     Despite performing a detailed physical examination of each of the Carranos' 104 seized Heritage Chickens and setting forth a separate written summary of the results of each of those examinations, accompanied by a color photograph of each bird, there is *nothing* in the Liu Report indicating that a single one of the Carranos' birds was maintained in less than excellent health and physical condition on the Carranos' farm.  Indeed, even the thumbnail photos in the Liu Report clearly show the vitality and beauty of these rare and valuable animals, the result of the many years of the Carranos' experience, breeding and care.  See Liu Report at pp. 3-11.

34.     Notably, while the Liu Report asserts that Drs. Liu and Touroo "assisted with the evaluation and removal of animals during the execution of the search warrant" and "provided on scene medical triage," there is no claim in the report that a single one of the Carranos' birds needed any medical care whatsoever, let alone that such care was provided.

35.     The Liu Report focused instead on whether the Carranos' birds had been trimmed, dubbed or labeled,  presumably to assist the government in making its case against Mr. Carrano.  The report reveals no understanding of why the birds might have

11

been properly trimmed or dubbed for health and safety reasons, or the significance of wing and/or leg bands setting forth breeding and bloodline. The inspection of the birds would have been in better hands if it had been conducted by a qualified poultry show judge.

36.    In the criminal case, the government avoided producing Dr. Liu, Dr. Touroo or any other ASPCA personnel as witnesses at Mr. Carrano's trial. The veterinarians would have had to admit that their inspection of the Carranos's birds shortly after the seizure showed that they were in perfect health and physical condition and that there was no evidence of fighting, abuse or any other mistreatment of the birds on the Carranos' farm.

37.    The government also avoided producing another highly-placed ASPCA employee who had prepared a report regarding the seizure and impoundment of the Carranos' birds. John Bolin, who had been hired in 2014 to take a lead investigative role in the ASPCA's expanding Anti-Cruelty Group, was its Northeast Regional Investigator. After 17 years in federal and state law enforcement, including work as a criminal investigator with the Indiana Gaming Commission, leading the takedown of large cockfighting and dogfighting cases, Bolin became disillusioned by the damage caused by animal rights organizations inserting themselves into law enforcement. He left the ASPCA shortly after the raid on the Carranos' farm, and has since repeatedly spoken out on the misguided efforts of these organizations. *See*, *e.g.*, Trent Loos Second Interview

12

with John Bolin, March 7, 2018, available at www.youtube.com/watch?v=Ml58b_e-pD0

(last visited August 10, 2021).

Housing and Treatment of the Carranos' Heritage Chickens by the Defendants

38.    The Liu Report states that ASPCA employees transported the Carranos'

Heritage Chickens from the Carranos' farm to "an ASPCA temporary shelter," where

Drs. Liu and Touroo performed "veterinary forensic medical exams" on the birds:

> 104 chickens were removed from the property. 28 of the birds (26 chicks
> and 2 hens) were transported by ASPCA employees, Roni Afriat, Alison
> Liu and Rachel Touroo, from the scene to an ASPCA temporary shelter.
> ASPCA Field Investigations and Response professional responders, Dave
> Marcantel and Tammy Gregory, transported the remaining 76 birds to the
> shelter. (Liu Report at p.1).

39.    The Liu Report does not identify the "temporary shelter" where the

Carranos' birds were initially kept by the ASPCA.  Upon information and belief, the

ASPCA does not own or operate any animal shelters in the upstate New York region.

Whether the "temporary shelter" referenced in the Liu Report was one of the facilities

owned and operating by Defendants Lollypop, Jamestown or Cracker Box (collectively,

"the defendant facilities") is unknown to the Carranos, but is known to some or all of the

Defendants.

40.    Similarly, the Carranos' knowledge of the locations of their impounded

birds at all other times during the nearly three year period after the birds were seized from

their farm is limited by the information provided by the government during the litigation.

13

At the Carranos' repeated insistence, during that entire nearly three-year period, the government provided two incomplete and unreliable inventories and permitted the Carranos to make two extremely limited visual inspections of the birds at the defendant facilities.

41. The inventories, which used identification codes from the Liu Report, failed to indicate the fact or timing of any births, deaths, injuries or general condition of the birds. The identification numbers, as the Carranos later learned, were written with non-indelible ink on poorly attached legbands. Many birds were unrecognizable due to the loss of feathers, health and color. Others were clearly not Heritage Chickens and simply had been mixed in with the Carranos' birds.

42. The first inspection took place at Jamestown and Lollypop on September 17, 2017, about four months after the seizure. Present were the Carranos, their consultant Anthony Saville, a New York City Police Department officer and an agent from the Department of Agriculture. The second inspection took place at Jamestown, Lollypop and Cracker Box on January 25, 2019. The Carranos and Mr. Saville were permitted to observe and take photographs of the birds, but were not allowed to come closer than five feet away, precluding them from conducting a meaningful inspection of the birds' physical condition.

43. The inventories and inspections, as well as the government's court submissions, establish and confirm that a significant number of the Carranos' birds were

14

kept at each of the defendant facilities for a substantial period of time.

44. The conditions in which they were kept demonstrated that each of the defendant facilities was grossly uninformed regarding even the basics of properly caring for any chickens, let alone rare bloodline gamefowl like the Carranos' Heritage Chickens. None of the websites maintained by the defendant facilities even claim that they accept chickens, let alone that they have facilities to properly house and care for chickens.

45. Jamestown, which apparently housed most of the Carranos' Heritage roosters, kept these birds in underground dog kennels, with grossly inadequate light, air, food, water, exercise and general care.

46. At Lollypop, the birds in their care, mostly hens, chicks and younger birds, were kept together in horse stables and/or a large pen.  The persons operating the Lollypop facility were apparently unaware that hens, if kept together, will fight, just like roosters.  Further, at the second inspection, the Carranos observed and photographed a "rat hole" leading into the pen and evidence of a rat attack on at least one of the birds.

47. At Cracker Box, the Carranos' birds were kept in coops inside a barn with inadequate light and air.  The operators provided heaters in the coops, apparently unaware that, rather than benefiting chickens, heaters will promote bacteria-borne sickness in an enclosed environment.

48. Even from more than five feet away, and with many of the chickens' feet and legs hidden under piles of wood shavings, it was obvious to the Carranos and others

15

Case 1:21-cv-01105-WMS-LGF   Document 1-1   Filed 10/08/21   Page 18 of 38

that many of the chickens were severely injured and desperately in need of medical care. Birds were missing eyes, had broken or "slipped" bills, had been scalped by other birds, had damaged or partially regrown spurs and had missing or broken feet and toes. Many could no longer eat or drink without assistance because of these injuries. Some adult birds were unable to eat because their food was in a "chick feeder" made for young birds, not full grown adults with untrimmed combs. Ironically, while the government was claiming in the litigation that trimmed spurs were proof of cockfighting, the defendant facilities' failure to trim the spurs of the Carranos' chickens resulted in severe injuries to the birds.

Failure and Refusal of the Defendants to Provide Medical Care to Carranos' Birds

49.     The ASPCA was quick to provide veterinary services for all 104 of the Carranos' seized birds when the goal was to try to help support the government's false allegations that the birds had been involved in cockfighting. When the birds were severely injured on the ASPCA's watch, however, no such veterinary services were forthcoming.

50.     After the first inspection, Anthony Saville prepared a report regarding the egregious conditions in which the Carranos' birds were being kept at Jamestown and Lollypop. The Carranos provided that report to the government. Yet, no responsibility was acknowledged and no changes to the birds' housing or treatment were made.

16

Case 1:21-cv-01105-WMS-LGF    Document 1-1    Filed 10/08/21    Page 19 of 38

51.     The second inspection revealed an even more dire situation.  At least 20 more birds had died and many hatched chicks had been killed.  Numerous seized birds were unaccounted for, including all of the impounded 20 baby chicks noted in the Liu Report.  Nothing had been done about the grossly insufficient light, water, air, feeding and living conditions to which the Carranos' birds were being subjected.  At least 58 of the 79 surviving animals showed substantial evidence of severe physical and mental deterioration.  Additional photos showed a "rat hole" leading into one of the cages and evidence of a rat attack on one of the birds.

52.     With dozens of their birds dead and more in dire condition, the Carranos petitioned the court to direct the government to arrange for veterinary care for their remaining birds.  The government opposed the request.  In support, the government cited to a discussion it had with counsel for the ASPCA, who was "deeply disturbed by the false accusations contained" in the Carranos' submission but failed to submit anything, either directly or from any of the defendant facilities, actually denying the Carranos' allegations, which were supported by a consultant's report and dozens of photographs.

53.     The government response further claimed that "[t]he ASPCA has provided, and will continue to provide, veterinary care to the animals that are the subject of this proceeding."

54.     There was, however, no support provided for this assertion.  The response failed to assert what kind of veterinary care was allegedly provided, who provided it or

17

Case 1:21-cv-01105-WMS-LGF   Document 1-1   Filed 10/08/21   Page 20 of 38

when was it provided.   In fact, to date, no specifics or documentation evidencing any medical care for the nearly three years that the Carranos' birds were detained has ever been provided.

55.   Further, as the government itself argued in opposition to the Carranos' request, veterinary care is expensive.  Indeed, the government's primary position was that any veterinary examination of the birds should be paid for by the Carranos.  Had the ASPCA or the defendant facilities actually provided "veterinary care to the animals that are the subject of this proceeding," not only would there have been a written record of it, but someone would have had to pay for it.  Yet, there was no indication of any expenses incurred by the government or anyone else for such care.  To the contrary, the government made it clear that it had no intention of incurring any such expense.

56.   The failure and/or refusal of the ASPCA and the defendant facilities to provide veterinary care for the Carranos' birds while in their custody and control violated, *inter alia*, 7 U.S.C. § 2156(e), which requires that "[n]ecessary care including veterinary treatment shall be provided while the animals are so held in custody" after seizure. Ironically, this is the statute pursuant to which the federal claims and charges against Mr. Carrano were filed.

57.   The government also opposed the Carranos' request that the government report "the location, offspring and, where applicable, the date and cause of death of each of the seized birds and their offspring, together with any autopsy reports."  This

18

information has never been provided. Thus, there appear to be no records reflecting the deaths of the Carranos' birds (and their offspring) while in the custody and control of the ASPCA and the defendant facilities, including the dates, causes and locations of each such death.

## The Government Abandons All Attempts to Forfeit the Birds and Returns Them to the Carranos

58.    With no proof that any of the Carranos' Heritage Chickens had ever been involved in cockfighting, the government's civil and criminal forfeiture cases collapsed.

59.    The criminal forfeiture case fell apart first. The criminal case was founded on alleged violations of the "animal fighting venture" law, 7 U.S.C. § 2156. However, with no proof an actual "animal fighting venture," the government proceeded to trial solely on the charge of *conspiracy* to commit a violation of the statute, based, as discussed above, largely on social media posts and other questionable evidence.

60.    The failure of proof of an actual "animal fighting venture" involving the Carranos' Heritage Chickens was fatal to the government's attempt to forfeit the birds in the criminal proceeding. The statute limits forfeiture to "any animal involved in a violation". 7 U.S.C. § 2156(e). There was no proof that a single one of the Carranos' birds was "involved in" cockfighting.

61.    Mr. Carrano's attorney filed a motion to dismiss the criminal forfeiture allegations, pointing out that conspiracy alone is insufficient to support forfeiture under

19

the animal fighting venture statute because it fails to satisfy the requirement that the animal(s) have been "involved in" a fighting venture. After a hearing before District Judge Stein on November 21, 2018, the government withdrew its criminal forfeiture claim. The claim was then dismissed in a Court Order. *See U.S. v. Carrano*, 17-Cr-460, Dkt. 100 (Nov. 27, 2018) (Gov't letter); *Id.*, Dkt. 101 (Nov. 29, 2018).

62. The government informed the District Court that, although it was dropping its criminal forfeiture case, it still "intend[ed] to pursue civil forfeiture" in the pending civil proceeding.

63. The government's backup plan to forfeit the Carranos' birds in the civil proceeding failed as well. This was due in no small part to the Defendants' gross mistreatment of the birds. In fact, the destruction of the Carranos' birds by the Defendants was so complete that the government was unable to find an acceptable home for them. Physically and mentally, the surviving chickens had been reduced to 'special needs' birds. In April 2019, pursuant to an interim consent agreement, 29 birds were returned to the Carranos' farm, the same farm where the illegal activity had purportedly taken place. The terms of Mr. Carrano's criminal case required anyone other than Mr. Carrano to care for the birds. This requirement gave rise to a cruel irony. Mrs. Carrano is employed as a teacher for special needs students at an area BOCES school. Thus, for a period of many months, Mrs. Carrano would tend to special needs humans for eight hours a day, then return home and spend several more hours caring for what now had become 'special

20

Case 1:21-cv-01105-WMS-LGF    Document 1-1    Filed 10/08/21    Page 23 of 38

needs' chickens.

64.     In March 2020, the government agreed to dismiss the civil forfeiture proceeding with prejudice and return the remaining birds to the Carranos. *See United States v. Any and All Roosters*, Doc. 59, Stipulation and Order, filed March 6, 2020.

65.     Thus, while virtually every one of the Carranos' Heritage Chickens was either killed, maimed and/or deranged by the Defendants' actions, not a single bird was forfeited by the government.

66.     Although the Stipulation and Order included the government's boilerplate language that barred claims from being brought against the government or the NYPD relating to the Carranos' birds, it expressly excluded the ASPCA and "any facilities that provided care and/or treatment" for the birds from that protection:

> Nothing in this Stipulation and Order shall be construed to waive or limit any claim which Claimants may have against the American Society for the Prevention of Cruelty to Animals ('ASPCA') arising from the ASPCA's care of the Birds while in the ASPCA's custody. Nothing in this Stipulation and Order shall be construed to waive or limit any claim which Claimants may have against any facilities that provided care and/or treatment for or transported the Birds since their seizure on or about May 23, 2017 . . ..

Stipulation and Order, Doc. 59 at pp. 3-5.

67.     The Court so-Ordered the parties' Stipulation, including the language above. *See United States v. Any and All Roosters*, Doc. 59, Stipulation and Order, filed March 6, 2020.

21

Summary of Damage to the Carranos' Birds

68.    At least 8 adult males (cocks), valued by independent Heritage Chicken experts at a total of no less than $167,000.00, were killed or lost while in ASPCA custody.

69.    At least 3 adolescent males (stags), valued by independent Heritage Chicken experts at a total of no less than $3,000.00, were killed while in ASPCA custody.

70.    At least 2 adolescent males (stags), valued by independent Heritage Chicken experts at a total of no less than $2,500, were permanently maimed while in ASPCA custody.

71.    At least 12 adult females (hens), valued by independent Heritage Chicken experts at a total of no less than $326,000, were killed or lost while in ASPCA custody. The deaths of two of the hens, bred by Joe Zanino, who is now deceased, terminated their bloodlines.

72.    At least 10 adolescent females (pullets), valued by independent Heritage Chicken experts at a total of no less than $8,000, were killed or lost while in ASPCA custody.

73.    At least 24 chicks valued by independent Heritage Chicken experts at a total of no less than $12,000, were killed or lost while in ASPCA custody.

74.    More than 300 Heritage Chicken eggs, valued by independent Heritage Chicken experts at a total of no less that $150,000, were deliberately broken during the

22

raid of the Carranos' farm while under the supervision of ASPCA personnel, including at least two veterinarians.

75.    The 59 chickens that survived have all suffered mental and physical disability as a result of their mistreatment while in ASPCA custody, disqualifying them from gamefowl exhibitions, destroying their breeding value and drastically increasing the labor and expense of keeping them alive.  The entire value of these chickens has therefore been destroyed.  The total value of these 59 cocks, stags, hens and pullets has been determined to be no less that $442,500 by independent Heritage Chicken experts.

76.    Heritage Chickens are valuable not only as individual chickens, but also for their ability to reproduce.  The damage to the Carranos' Heritage Chickens caused by the gross negligence of the Defendants extinguished the four primary bloodlines painstakingly preserved by the Carranos during nearly a decade of breeding – Zanino Whites, McLean Hatches, Groves White Hackles and Sweater Maginnis Greys.  If the Defendants had returned the Carranos' Heritage Chickens in the same pristine health and condition they were when they were seized (as verified by the Liu Report), the Carranos could have continued to breed these valuable birds for decades, resulting in the birth of nearly 100 such birds each year.

77.    The threat of extinction of a valuable bloodline has been deemed to constitute irreparable harm for purposes of injunctive relief.  *See*, *e.g.*, *Kathrens v. Zinke*, 323 F. Supp. 3d 1142, 1153 (D. Mont. 2018).  Here, the extinction of the Carranos' four

23

Case 1:21-cv-01105-WMS-LGF   Document 1-1   Filed 10/08/21   Page 26 of 38

Heritage Chicken bloodlines has already taken place as a proximate result of the Defendants' gross negligence. The loss of these bloodlines has resulted in damages to be assessed by the Court, but in no event less than $1 million per bloodline. Thus, the Carranos are entitled to an additional $4 million in damages for these losses.

Liability of the ASPCA

78.     The ASPCA is fully liable for all damage to the birds regardless of where they were kept. The ASCPA's "custody and control" over the birds from the day they were seized until the moment the last bird was returned was repeatedly affirmed in official court filings. *See United States v. Any and All Roosters and Hens Seized On Or About May 23, 2017 From 751 Whitney Road, Ontario, NY 14519 and Any Progeny Thereof*, Case 1:17-cv-05718-JPO, Doc. 1, Government's Verified Complaint for Forfeiture, ¶ 15 (S.D.N.Y. July 27, 2017).

79.     The ASPCA also assumed responsibility for directing the care of the Carranos' birds at the defendant facilities, as well as the "temporary facility" referenced in the Liu Report, if that facility is different. *See United States v. Any and All Roosters*, Doc. 32, Letter from the Government to Judge J. Paul Oetken, at p.1, fn. 1 (S.D.N.Y. Jan. 28, 2019) ("The birds are being cared for, at the direction of the ASPCA, at three separate facilities, all of which are operated by respected and well-vetted animal rescue groups").

80.     Further court filings establish that the ASPCA directly participated in and

24

Case 1:21-cv-01105-WMS-LGF    Document 1-1    Filed 10/08/21    Page 27 of 38

supported the government's refusal to take any action to improve the egregiously substandard living conditions of the Carranos' birds at the defendant's facilities. These court filings, summarized above, also confirm the ASPCA's refusal to provide veterinary care for the birds despite extensive – and undisputed – proof submitted to the government and the court documenting their serious and life-threatening injuries and extremely poor general physical condition.

Liability of the Defendant Facilities

81.    While each of the defendant facilities caused the losses to the birds transferred to their facility, it is impracticable to apportion loss for numerous reasons. The inventories and tagging systems utilized to track the Carranos' birds are substantially inaccurate and unreliable. Despite the Carranos' repeated requests, they were never provided with updated inventories that recorded the dates and locations of the births, deaths and illnesses of the birds. For example, numerous chicks grew to maturity during their impoundment. Although the January 2019 inventory purported to record the transfer of a number of the chicks that survived the initial impoundment to Lollypop on July 13, 2017, it is impossible to identify those birds because, *inter alia*, their sex upon maturity was not recorded or provided and the tagging system was useless because the tags were not securely attached and the ones that survived were illegible. Thus, while some of the birds returned to the Carranos can be traced to their respective defendant facilities, most

25

cannot, and any attempt to engage in such tracing will necessarily and substantially understate the losses caused by each facility.

82.     Further, all of the defendant facilities agreed to take possession of the Carranos' birds apparently without taking the necessary steps to ensure that the birds would be housed and treated humanely, in contravention of their legal and ethical duties as well as their core missions.  There is no evidence that the defendant facilities provided adequate, if any, veterinary care for the Carranos' birds, despite the fact that many were maimed and in clear need of such care for many reasons.

83.     The Carranos' inspections, memorialized in numerous photographs, as well as in at least one report prepared by the New York City Police Department, establish that none of the defendant facilities provided the birds with necessary access to food and water and many were not even kept safe from attack by other birds or rats.  Further, there is no evidence that the defendant facilities maintained their own records.  Therefore, it is appropriate that the burden be placed on each of the defendant facilities to demonstrate which birds were *not* in their possession and care.

84.     Thus, it is appropriate to find that the defendant facilities acted in concert with the ASPCA to deprive the Carranos' birds of appropriate housing and care. Accordingly, imposition of joint and several liability for compensatory damages is warranted.

26

Case 1:21-cv-01105-WMS-LGF   Document 1-1   Filed 10/08/21   Page 29 of 38

## AS AND FOR A FIRST CAUSE OF ACTION FOR NEGLIGENCE *PER SE* – Violation of § 365 of the New York Agriculture and Markets Law

85. The Carranos repeat and reallege the allegations set forth in paragraph 1 through 84, inclusive, as if fully set forth herein.

86. The failure of the Defendants to ensure that the Carranos' birds in their custody and control were provided, during their impoundment and confinement, with "a sufficient supply of good and wholesome air, food, shelter and water" violated section 356 of the New York Agriculture and Markets Law.

87. N.Y. Agr. & Mkts. L. § 356 applies to those who are authorized to impound animals as part of their job duties. *See*, *e.g.*, *People v. Fritze*, 28 Misc. 3d 1220(A), 957 N.Y.S.2d 638 (Dist. Ct. Nassau County 2010). Thus, there is no 'public good' defense to a violation of the statute.

88. Further, N.Y. Agr. & Mkts. L. § 356 is applied disjunctively. Therefore, the violation of any of the requirements of the statute is sufficient to establish a violation of the statute:

> [I]f defendant provides an animal he has confined with food and water, and some form of shelter, but keeps that animal confined in a dark, airless space, or if he provides food, shelter and air, but no water, the Defendant has failed in his obligation to properly tend to the confined animal. All four basic requirements of life must be provided by Defendant to the confined animal for the obligations imposed by AM 356 to be met. If any one is missing, Defendant has failed to care for the animals under his confinement.

*People v. Hock*, 31 Misc. 3d 896, 919 N.Y.S.2d 835 (Crim. Ct. Kings County 2011),

*rev'd on speedy trial grounds*, 40 Misc. 3d 141(A), 977 N.Y.S.2d 668 (App. Term 2d

27

Case 1:21-cv-01105-WMS-LGF Document 1-1 Filed 10/08/21 Page 30 of 38

Dep't 2013).

89.     The Defendants committed and/or permitted the commission of hundreds of violations of N.Y. Agr. & Mkts. L. § 356.  Those violations establish breach of duty as a matter of law.

90.     The Defendants' breaches of duty proximately caused damage to the Carranos' birds.

91.     The Defendants are therefore jointly and severally liable to the Carrranos under the doctrine of negligence *per se* in an amount to be determined at trial, but no less than a total of $5,111,000 in compensatory damages.

### AS AND FOR A SECOND CAUSE OF ACTION FOR NEGLIGENCE *PER SE* – Violation of 7 U.S.C. § 2156 of the Federal Animal Fighting Venture Law

92.     The Carranos repeat and reallege the allegations set forth in paragraph 1 through 91, inclusive, as if fully set forth herein.

93.     The Carranos' purportedly seized pursuant to 7 U.S.C. § 2156, a federal statute prohibiting "animal fighting ventures."

94.     Animals seized pursuant to 7 U.S.C. § 2156(e) must be provided with "[n]ecessary care including veterinary treatment" while in custody.

95.     The Defendants failed and/or refused to provide such care, despite repeated due demand by the Carranos.

96.     The failure and/or refusal of the Defendants to provide "[n]ecessary care

28

including veterinary treatment" for the Carranos' birds while in the Defendants' custody and control violated 7 U.S.C. § 2156(e). Those violations establish multiple breaches of duty as a matter of law.

97.    The Defendants' breaches of duty proximately caused damage to the Carranos' birds.

98.    The Defendants are therefore jointly and severally liable to the Carrranos under the doctrine of negligence *per se* in an amount to be determined at trial, but no less than a total of $5,111,000 in compensatory damages.

**AS AND FOR A THIRD CAUSE OF ACTION FOR GROSS NEGLIGENCE**

99.    The Carranos repeat and reallege the allegations set forth in paragraph 1 through 98, inclusive, as if fully set forth herein.

100.    In permitting the Carranos' birds to be killed and/or seriously injured by failing to take basic steps to protect them from each other, in failing to adhere to even minimal standards of humane confinement required to ensure the health of chickens, including failure to provide ventilation, perches, light, exercise and accessible food, in failing to ascertain the requirements for properly keeping chickens and/or, upon information and belief, in failing to provide the birds with basic medical care for nearly three years or consult others who have knowledge of the proper treatment of chickens, the Defendants evinced a reckless disregard for the safety and health of the Carranos'

29

chickens.

101.    The Defendants's gross negligence proximately caused damage to the Carranos' property.

102.    The Defendants are therefore jointly and severally liable to the Carrranos arising from its gross negligence in an amount to be determined at trial, no less than a total of $5,111,000 in compensatory damages.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR PUNITIVE DAMAGES

103.    The Carranos repeat and reallege the allegations set forth in paragraph 1 through 102, inclusive, as if fully set forth herein.

104.    There is extensive, clear and convincing evidence of the gross mistreatment of the Carranos' birds while in the Defendants' custody and control.

105.    The Defendants are non-profit entities that receive substantial donations based on their representations to the public that these funds will be used to fight animal cruelty and protect and promote the health, safety and well-being of abused and at-risk animals.

106.    For example, on its website, the ASPCA's President and CEO asserts that the donations received by the organization are "saving lives and elevating our society and its laws to ensure cruelty victims and other at-risk animals receive the protection and care they deserve."

30

107.    On the Lollypop website, it states that "[a]t the very core of our organization is our charge to end animal abuse." They claim to maintain a "team of law enforcement officers, speaking out for the voiceless to hold animal abusers accountable – saving countless lives."

108.    The Jamestown website states that its mission "is to improve and save lives through compassionate care [and] advocacy for animals . . .."

109.    In its 2019 federal tax form 990, Cracker Box represented that its mission is "to provide a safe and humane environment for abandoned or mistreated farm animals." On its website, Cracker Box asserts that it provides animals at its farm with "necessary adjustment time and veterinary care . . .."

110.    The degree to which the Defendants' reckless disregard for the health and safety of the Carranos' birds that proximately caused their deaths and physical and mental harm directly contradicts the image they cultivate to raise money is shocking to the conscience.

111.    The Defendants should be punished for their shocking and profitable hypocrisy.

112.    The imposition of punitive damages against the Defendants will help deter them in the future from, *inter alia*, (a) blindly agreeing to partner with or assist law enforcement without sufficient independent judgment and prior investigation, and (b) undertaking the care of breeds of animals for which they lack necessary experience and

31

Case 1:21-cv-01105-WMS-LGF Document 1-1 Filed 10/08/21 Page 34 of 38

expertise, particularly ancient breeds like the Carranos' gamefowl, without making the investment of time and resources to learn what is truly in the best interests of the health, safety and well-being of the animals they are purporting to assist.

113. Although the Defendants are each liable for punitive damages, the appropriate amount for each varies based on their ability to pay. Accordingly, for their cruelty, gross mistreatment and destruction of the Carranos' birds, in addition to compensatory damages, the Defendants should be assessed punitive damages in the following amounts:

- The ASPCA should be assessed punitive damages in the sum of $50,000,000.00;

- Lollypop should be assessed punitive damages in the sum of $5,000,000.00

- Jamestown should be assessed punitive damages in the sum of $500,000.00, and

- Cracker Box should be assessed punitive damages in the sum of $100,000.00.

**WHEREFORE**, the Carranos demand judgment against the Defendants as follows:

1. On the First Cause of Action for Negligence *Per Se* – Violation of § 365 of the New York Agriculture and Markets Law, compensatory damages in an

32

amount to be determined at trial, but no less than $5,110,000.00;

2.    On the Second Cause of Action for Negligence *Per Se* – Violation of 7 U.S.C. § 2156 of the Federal Animal Fighting Venture Law, compensatory damages in an amount to be determined at trial, but no less than $5,110,000.00;

3.    On the Third Cause of Action for Gross Negligence, compensatory damages in an amount to be determined at trial, but no less than $5,110,000.00;

4.    On the Fourth Cause of Action for Punitive Damages, punitive damages against (a) the ASPCA in the sum of $10,000,000.00, (b) Lollypop in the sum of $5,000,000.00, and (c) Jamestown in the sum of $500,000.00 and Cracker Box in the sum of $100,000.00,

with costs, interests and attorneys' fees, together with such other and further relief as this Court deems just and proper.

Dated:     New Rochelle, New York
           August 10, 2021

                                   Respectfully submitted,

                                   LAW OFFICES OF STEVEN L. KESSLER

                          By:     *Steven L. Kessler*

                                   *Attorneys for Plaintiffs Thomas Carrano*
                                   *    and Gina Carrano*
                                   P.O. Box 100, Wykagyl Station
                                   New Rochelle, New York 10804
                                   (212) 661-1500
                                   KesslerLawNYC@gmail.com

33

# VERIFICATION

Thomas Carrano, being duly sworn, deposes and says:

I am a Plaintiff in the captioned action. I have read the foregoing Complaint and know the contents thereof. The same is true to my knowledge, except as to matters therein stated to be alleged on information and belief, and, as to those matters, I believe them to be true.

To the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of these papers or the contentions therein are not frivolous as defined in Subsection (c) of Section 130-1.1 of the Rules of the Chief Administrative Judge (22 NYCRR).

Thomas Carrano

Sworn to before me this
10   day of August, 2021

Notary Public

GEORGIA A. INTERLICCHIA
Notary Public, State of New York
No. 01IN4850150
Qualified in Wayne County
Commission Expires April 28, 2022

## VERIFICATION

Gina Carrano, being duly sworn, deposes and says:

I am a Plaintiff in the captioned action. I have read the foregoing Complaint and know the contents thereof. The same is true to my knowledge, except as to matters therein stated to be alleged on information and belief, and, as to those matters, I believe them to be true.

To the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of these papers or the contentions therein are not frivolous as defined in Subsection (c) of Section 130-1.1 of the Rules of the Chief Administrative Judge (22 NYCRR).

_Gina Carrano_
Gina Carrano

Sworn to before me this
10 day of August, 2021

_Notary Public_
Notary Public

GEORGIA A. INTERLICCHIA
Notary Public, State of New York
No. 01IN4850150
Qualified in Wayne County
Commission Expires April 28, 20 22

Case 1:21-cv-01105-WMS-LGF   Document 1-1   Filed 10/08/21   Page 38 of 38

SUPREME COURT OF THE STATE OF NEW YORK   INDEX NO.            /2021
COUNTY OF WAYNE

---

THOMAS CARRANO and GINA CARRANO,

Plaintiffs,

- against -

AMERICAN SOCIETY FOR THE PREVENTION
OF CRUELTY TO ANIMALS, THE HUMANE
SOCIETY OF ROCHESTER AND MONROE
COUNTY FOR THE PREVENTION OF CRUELTY
TO ANIMALS, INC., d/b/a LOLLYPOP FARM,
CHAUTAUQUA COUNTY HUMANE SOCIETY,
CRACKER BOX PALACE, INC.,

Defendants.

---

**SUMMONS and
VERIFIED COMPLAINT**

---

Signature (Rule 130-1.1-a)

/s/ *Steven L. Kessler*

---

**STEVEN L. KESSLER, ESQ.**

---

Steven L. Kessler
LAW OFFICES OF STEVEN L. KESSLER
*Attorneys for Plaintiffs*
Temporary Mailing Address:
P.O. Box 100, Wykagyl Station
New Rochelle, N.Y. 10017
(212) 661-1500